# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 4, 2013

## STATE OF TENNESSEE v. CHARLES PENNINGTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-07093        W. Mark Ward, Judge**

---

**No. W2012-01459-CCA-R3-CD  - Filed December 9, 2013**

---

A Shelby County Grand Jury returned an indictment against Defendant, Charles Pennington, charging him with first degree felony murder, attempted especially aggravated robbery, and employing a firearm in the commission of a felony.  Following a jury trial, Defendant was convicted of first degree felony murder and attempted especially aggravated robbery. Defendant was found not guilty of employing a firearm in the commission of a felony. Defendant was sentenced to life for the murder conviction, and by agreement with the State, to a concurrent sentence of twelve years for attempted especially aggravated robbery.  On appeal, Defendant argues that the evidence was insufficient to support his convictions.  After a thorough review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JEFFREY S. BIVINS, JJ., joined.

Stephen C. Bush, District Public Defender; Tony N. Drayton, Assistant Public Defender; Tim Albers, Assistant Public Defender; and Constance Barnes, Assistant Public Defender; Memphis, Tennessee, for the appellant, Charles Bennington.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin E. Doty, Assistant Attorney General; Amy P. Weirich, District Attorney General; Tracey Jones, Assistant District Attorney General; and Neal Oldham, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Heather Briscoe testified that her brother, Ross Penden, the victim, left her home in Texas on June 6, 2010, to return to Memphis, Tennessee. She said that the victim had stayed with her for several months while he painted her house and provided general contractor services. Ms. Briscoe testified that she had paid the victim approximately $7,000 in cash for the work that he provided.

On June 7, 2010, Officer Daniel Campbell of the Memphis Police Department responded to a carjacking in progress on Richmond Avenue. Officer Campbell and his partner, Officer Derek Wharton, drove to the area of Richmond Avenue near Orleans Street. Officer Campbell testified that before they arrived at the scene, he and Officer Wharton received a dispatch that the vehicle had moved to Orleans Street and South Parkway and that a shot had been fired.

Officers Campell and Wharton arrived on the scene at Orleans Street and South Parkway and observed a "maroon General Motors type four-door pickup parked in the street." The truck was running, and the victim was sitting in the driver's seat of the truck "slumped over with his head tilted to the right and his arms in his lap . . . had his foot on the accelerator and his head was tilted to the right and his eyes were glazed over." Officer Campbell explained that the vehicle was in park, but the engine was revving because the victim's foot was on the accelerator. He also noticed blood on the center of the victim's chest, and the victim was unresponsive. Officer Campbell then turned off the truck's motor and secured the scene. It was later determined that the victim died from a single gunshot wound to the chest.

Demonique Harris testified that on June 7, 2010, the victim called Jerome White's house located on "Park" and said that he would pick her up. Ms. Harris said that she told the victim, whom she knew through a friend, that she did not have any clean clothes, and he agreed to drive her to a laundromat in Arkansas. While at the laundromat, Ms. Harris noticed that the victim had several "hundreds and twenties," which she estimated to be approximately $2,000, and he paid for everything. She also acknowledged that she got angry with the victim because she called Mr. White from the victim's cell phone, and the victim took the phone away from her. After Ms. Harris finished washing and drying her clothes, the victim drove her back to Mr. White's house in Memphis to drop off the clothes. Ms. Harris then asked the victim to drive her to Mr. White's mother's house near Mississippi Boulevard and Richmond Avenue. Ms. Harris testified that the victim turned on South Parkway and then

turned right on Lapaloma Street. She said that the victim then stopped the truck and asked if he could "F [her] in the booty hole like he done [sic] to Keira and them." Ms. Harris testified that the victim grabbed her leg, and she hit him. The two struggled briefly, and the victim's phone fell from the center console onto the floor. Ms. Harris testified that she picked up the phone and called Mr. White, who was her boyfriend at the time, and said, "[T]his white B just put his hands up on me." She said that the victim grabbed the phone from her before she heard Mr. White say anything. Ms. Harris testified that the victim slapped her two or three times in the face, and she began crying. The victim began cussing her and then drove to Mississippi Boulevard and dropped her off where she walked to Mr. White's mother's house on Richmond Avenue.

Ms. Harris testified that when she walked into the house, Mr. White was there, and she told him what happened. She was angry, and her face was still red from being slapped by the victim. Ms. Harris said that she then told Mr. White that she had seen the victim with some money and that they were going to rob the victim. Ms. Harris testified that Mr. White agreed to rob the victim, and he went outside and talked to Defendant who also agreed to participate in the robbery. That evening, she called the victim and asked him to come back to Mr. White's mother's house to pick her up. Ms. Harris testified that the victim indicated that he was going to take some money to the bank, and it took a "little while" for him to come back to the house. Ms. Harris admitted that she called the victim multiple times to convince him to pick her up immediately.

Ms. Harris testified that she, Mr. White, and Defendant then walked down Richmond Avenue toward Orleans Street. Ms. Harris said that when the victim initially drove down Richmond Avenue looking for her, she was hiding behind a house, and Mr. White and Defendant were standing on the street. She said that she was hiding behind the house in order for Mr. White and Defendant to rob the victim. Ms. Harris then called the victim again and told him that he passed her. Ms. Harris stepped onto the sidewalk, and the victim "made the block and came back" to where Ms. Harris was standing. At that time, Mr. White was behind the house, and Defendant was behind some bushes. Ms. Harris testified that Defendant told her to jump into the truck when the victim pulled up, and Defendant would get in behind her. She said that when she got into the truck, Defendant entered behind her with a black 40-caliber gun. Ms. Harris testified that the victim and Defendant began tussling over the gun. She said that she became scared when the victim grabbed the gun, and she then jumped into the back seat.

Ms. Harris testified that the victim began driving with one leg while tussling with Defendant. She then opened the back door to get out of the truck, and she fell out of the vehicle. Ms. Harris testified that Mr. White ran after the truck, and "was like get him man, go on, get him man . . ." Ms. Harris said that she got up and ran behind the house. She left

-3-

her purse and baby gel in the victim's truck. Ms. Harris denied that she was "turning tricks" with the victim.

Jerome White testified that he was at his mother's home on Richmond Avenue on June 7, 2010, when Ms. Harris, his girlfriend, stopped by and told him that she had been with the victim. Mr. White referred to the victim as a "trick," indicating that the victim purchased prostitutes. Mr. White testified that Ms. Harris told him that the victim had beaten her, and she was angry. He also noticed bruises on her thighs and face. Ms. Harris told him that the victim had a substantial amount of money so they decided to rob him. Mr. White testified that he walked outside and saw Defendant standing across the street and talked to him. Ms. Harris later walked out of the house and told Defendant about the plan to rob the victim, and Defendant agreed to participate.

According to Mr. White, the plan was for him to distract the victim while Ms. Harris got into the victim's vehicle, and then Defendant was supposed to rob the victim. Mr. White testified that he, Defendant, and Ms. Harris walked down the street from his mother's house and then separated to wait for the victim to arrive. He said that Ms. Harris was walking down the street when the victim arrived, and he and defendant were on opposite sides of the street from each other. Mr. White testified that he and Defendant discussed the robbery by phone while waiting for the victim to arrive.

Mr. White testified that when the victim drove up and picked Ms. Harris up, Defendant "came out and snatched her out of the [truck]." Defendant then got into the victim's truck, and Mr. White ran up to the vehicle; however, it sped away. Mr. White testified that Ms. Harris fell when she got out of the vehicle, and she got up and ran away after the truck left. Mr. White did not see where the vehicle went, and he did not know if Defendant had a gun. He later talked with Defendant who said that he had made a "mistake." While he was talking to Defendant, the phone "broke up." Sometime later, Defendant's cousin picked up Mr. White and Ms. Harris around the corner from Richmond Avenue. Defendant was already in the vehicle. They did not discuss what had happened.

William Garrett testified that on June 7, 2010, he was living on Richmond Avenue. On that day, he walked out of the house, and noticed a white man in a red truck parked in front of the house looking around as if searching for something. Mr. Garrett felt that the behavior was "unusual in that neighborhood." The man then drove down the street, and a young man then approached Mr. Garrett and asked him where the "white guy" went. He informed the young man that the white man drove down the street. Mr. Garrett testified that the young man "just trotted away across the street." As Mr. Garrett was walking down the street, he noticed the red truck drive by a couple more times as if the driver were looking for something. Mr. Garrett noted that the driver stopped and looked between houses.

-4-

Mr. Garrett testified that the next time he saw the red truck, there was an African-American male in the vehicle struggling with the driver over what appeared to be a gun. The truck was still moving at the time, and Mr. Garrett observed the struggle for approximately 30 seconds. Mr. Garrett testified that approximately two to three minuets after the truck was no longer in his sight, he heard a gunshot. Mr. Garrett later identified Mr. White from a photo line-up as the person who asked him which way the white man went.

Eddie Ward testified that on June 7, 2010, he was in his front yard at 660 Richmond Avenue mowing the lawn. He said that his house was located approximately 30 yards from Orleans Street. Mr. Ward testified that he noticed "a red truck coming down the street real fast driving all over the street," and he ran to his porch. He noticed that a white man and a black man appeared to wrestling inside the truck. Mr. Ward testified that the black man had a gun and was trying to get out of the truck, but the white man would not let him go. He said that the black man's leg and the gun were hanging out of the truck. Mr. Ward testified that the truck made a left on Orleans Street and stopped at Orleans Street and South Parkway. He did not see or hear anything else. He later identified Defendant from a photo line-up as the person he saw in the truck with a gun wrestling with the white man.

Lavell Pennington testified that he was at the Southland Mall on June 7, 2010, when he received a call from Jerome White, who said that he needed a ride. Mr. Pennington testified that he picked Mr. White, Ms. Harris, and Defendant, who was his cousin, up on Mississippi Boulevard. Mr. Pennington did not recall talking to police on June 16, 2010, and telling them that Defendant called him and asked for a ride and that they discussed what happened. He also did not recall telling police that Defendant told him that he jumped in the victim's vehicle when the victim slowed down to let Ms. Harris out of the truck or that Defendant admitted to killing the victim. Mr. Pennington further did not recall telling police that he attempted to rob the victim and that the robbery was arranged by Ms. Harris. He also did not recall telling police that Defendant said that during the attempted robbery, he and the victim began fighting over control of the 40-caliber handgun that Defendant was armed with and that one shot was fired from the weapon. Mr. Pennington claimed that he was intoxicated at the time he gave the statement. He admitted that he identified Defendant and Mr. White from a photographic lineup.

Clarence Jackson testified that on June 7, 2010, he was living at 7718 Richmond Avenue, Apartment One. That evening, as he was walking out the door, he saw a red truck drive by with two men wrestling over a gun. He also saw another man running behind the truck. Mr. Jackson testified that the driver of the truck was white, and the passenger was black. He said that the driver had his hand on the steering wheel, and the passenger had both hands on the gun. Mr. Jackson testified that the white man was trying to drive and keep the

"gun off him." He said that the truck drove toward South Parkway, and he did not see it anymore.

The victim's truck was processed by Officers Dwayne Johnson and Hope Smith from the Crime Scene Unit of the Memphis Police Department. From the scene it appeared to Officer Johnson that someone had reached into the victim's glove compartment and removed the vehicle registration papers, which were left on the passenger's seat. The victim's wallet contained $39, and no other money was found in the truck. Officer Smith found fingerprints on the vehicle registration and sent them to be processed. At trial, the parties stipulated that the prints belonged to Defendant.

## II. Analysis

Defendant challenges the sufficiency of the evidence for his convictions of first degree felony murder and attempted especially aggravated robbery. He argues that there was insufficient evidence to corroborate the testimony of the two accomplices, Demonique Harris and Jerome White. We disagree.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

It is well-settled that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). Regarding the rule of corroboration, our Supreme Court has stated:

The rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The

corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

*Sherrill v. State*, 204 Tenn. 427, 321 S.W.2d 811, 815 (1959). "In short, the evidence must confirm in some manner that (a) a crime has been committed and (b) the accused committed the crime." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). However, Tennessee requires only a modicum of evidence in order to sufficiently corroborate such testimony. *State v. Copeland*, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984).

To support Defendant's conviction for first degree felony murder, the State was required to prove that Defendant killed the victim in the "perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy . . ." Tenn. Code Ann. § 39-13-202(a)(2). Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is accomplished with a deadly weapon and results in the victim suffering serious bodily injury. Tenn. Code Ann. § 39-13-401(a), -403(a). When a defendant is charged with the attempted commission of a crime, there must be evidence that the defendant "[has acted] with the kind of culpability otherwise required for the offense" or "[has acted] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; . . . Tenn. Code Ann. § 39-12-101(a)(1), (2). Criminal attempt also occurs when the defendant "[a]cts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3).

Viewing the evidence in a light most favorable to the State, the proof showed that Demonique Harris, Jerome White, and Defendant agreed to a plan to rob the victim, whom Ms. Harris had seen carrying what she estimated to be $2,000. Ms. Harris testified that she lured the victim back to the area of Mr. White's mother's house to pick her up. She initially hid behind a house so that the victim had to circle around the block to pick her up. Ms. Harris testified that Defendant hid behind some bushes, and Mr. White hid across the street. She said that Defendant had told her that he would enter the victim's truck behind her to rob the victim. When the victim pulled over to let Ms. Harris into the vehicle, Defendant entered behind her with a black 40-caliber handgun, and she jumped into the back seat. Ms. Harris testified that she attempted to exit the truck when Defendant and the victim began wrestling

over the weapon, and she fell out of the vehicle. She said that she saw Mr. White running toward the victim's truck yelling at Defendant to get the victim. She then got up and ran away.

Mr. White testified that it was the plan for him to distract the victim while Ms. Harris got into the victim's truck, and Defendant was supposed to rob the victim. He admitted that he, Defendant, and Ms. Harris walked down the street from his mother's house and then separated to wait for the victim to arrive. When the victim ultimately arrived, Ms. Harris was walking down the street, and he and Defendant were on opposite sides of the street from one another. He and Defendant had discussed the robbery while waiting for the victim to arrive.

Mr. White testified that when Ms. Harris got into the victim's truck, Defendant "came out and snatched her out of the [truck]." Defendant then got into the vehicle, and when Mr. White ran up, the truck sped away. Mr. White did not see where it went. He later talked with Defendant who said that he had made a "mistake."

Ms. Harris and Mr. White's testimony was corroborated by several witnesses at trial. William Garrett, who lived on Richmond Avenue, testified that on June 7, 2010, he saw a white man in a red truck parked in front of Mr. Garrett's house looking around as if searching for something. Mr. Garrett testified that the man drove down the street, and a young man, who Mr. Garrett later identified as Jerome White, approached Mr. Garrett and asked him where the "white guy" went. Mr. Garrett told him that the white man drove down the street, and Mr. White "just trotted away across the street." Mr. Garrett noticed the red truck drive by a couple more times as if the driver were looking for something. He noticed that the driver stopped and looked in between houses. Mr. Garrett testified that the next time he saw the vehicle, there was a black male in the truck struggling with the driver over what appeared to be a gun. Approximately two or three minutes after the truck was no longer in his sight, Mr. Garrett heard a gunshot.

Eddie Ward, who also lived on Richmond Avenue, testified that he was mowing his lawn on June 7, 2010, when he noticed a "red truck coming down the street real fast driving all over the street." Mr. Ward ran up onto his porch and observed a white man and a black man who appeared to be wrestling inside the truck. Mr. Ward testified that the black man, who he later identified from a photo line-up as Defendant, had a gun and was attempting to exit the vehicle; however, the white man would not let go of him. He said that Defendant's leg and the gun were hanging out of the truck. Mr. Ward testified that the truck made a left turn on Orleans Street and stopped at Orleans Street and South Parkway.

Clarence Jackson also testified he lived on Richmond Avenue, and on the evening of June 7, 2010, he saw a red truck drive by with two men wrestling over a gun. He saw

another man running behind the truck. Mr. Jackson observed that the driver of the truck was white, and the passenger was black. He said that the driver's hand was on the steering wheel, and the passenger had both hands on the gun. Mr. Jackson testified that the driver was trying to drive and keep the "gun off him." He said that the truck drove toward South Parkway.

It was stipulated at trial that Defendant's fingerprints were found on the registration papers to the victim's truck. The victim was later found deceased in his truck, with the motor still running, at the intersection of Orleans Street and South Parkway with a gunshot wound to his chest.

Based on our review of the evidence, we conclude that Ms. Harris and Mr. White's testimony was sufficiently corroborated, and the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for first degree felony murder and attempted especially aggravated robbery. Defendant is not entitled to relief on this issue.

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE